### THIRD CRIMINAL JUDICIAL DISTRICT COURT
### OF HUDSON COUNTY.

STATE OF NEW JERSEY v. ROBERT McNAMEE AND JAMES GOODMAN.

Decided July 24, 1942.

For the state on behalf of complaining witness, *Henry A. Matera (James F. Murray,* of counsel).

For the defendant Robert McNamee, *Nicholas S. Schloeder.*

For the defendant James Goodman, *Joseph V. Cullum.*

LUNN, D. C. J. The defendants, Robert McNamee and James Goodman, are charged with conspiracy, in that they willfully and unlawfully combined together, or by other alliance on March 27th and March 31st, 1942, to illegally and corruptly obtain the sum of $120.42, in the form of a salary check issued by the Board of Education of the Township of North Bergen to one William Long and pursuant to and in perpetration of their conspiracy, they committed certain overt acts by withholding the check from Long, who was legally entitled to it. The defendants, by refusing to waive their rights to indictment and trial by jury, have

declined to stand trial in this court, therefore, the province of this court is solely to determine if the complaint, and evidence offered in support of its allegations, warrant holding the defendants to await action of the grand jury.

The testimony adduced at the hearing, at which Mr. Long, his wife and a Mrs. Facey testified, was to the effect that Mr. Long resided with his family at 1410 Seventy-second Street, North Bergen, New Jersey, and has been continuously and regularly employed for many years, under tenure, as a manual training teacher by the Board of Education of North Bergen, and that in payment of his salary, the board had made to his order and issued the check involved, and caused it to be given to its secretary, James Goodman, one of the defendants, for delivery to the payee.

On March 27th, 1942, Mr. Long applied to Mr. Goodman at the office of the board, for his salary check and was informed that by agreement with Mr. Robert McNamee of the mayor's office (the other defendant) he had delivered the check to McNamee and that it would be necessary for Mr. Long to obtain it from McNamee. On March 31st, 1942, Mr. Long (accompanied by his wife and Mrs. Facey) applied to Mr. McNamee for his check and that McNamee exhibited the check to him, but insisted that Mr. Long endorse it to him so that he might deduct therefrom a sum of money which he claimed was owing to the township for rent. Mr. Long declined to comply with this demand, and he and his wife and friend were peremptorily ordered out of the office. It was also established that Mr. Long's sole source of income is the salary which he receives as a teacher and that he and his wife and four young children are dependent upon his regular salary checks for support and maintenance, and that both of the defendants were acquainted with these circumstances, and did fully realize the great hardship he and his family might be caused as the result of their action.

Attorneys for the defendants moved to dismiss the complaint on several grounds which are herein considered.

It is contended that the defendants are municipal officers and are not civilly liable for illegal acts committed by them

in good faith in the discharge of their duties, and therefore, *a fortiori,* they are immune from criminal prosecution. *Grove* v. *Van Duyn,* 44 *N. J. L.* 654; *Tyrrell* v. *Burke,* 110 *Id.* 225; 164 *Atl. Rep.* 586.

For the defendants to claim the protection of this established principle of law, it must appear that they acted in good faith in the performance of a duty which they reasonably believed was imposed upon them, either by public statute, or by the nature of their office, concerning a matter "at least colorably under their jurisdiction."

Title 18, Revised Statutes, entitled "Education," section 18:5-54, provides that "The custodian of school moneys shall pay out the school moneys only on warrants signed by the president and district clerk or secretary of the board of education. Each warrant shall specify the object for which it is given, and shall be made payable to the order of the person entitled to receive the amount named therein."

Section 18:5-55 provides "In the payment of teachers * * * a pay-roll certified by the president and district clerk or secretary of the board of education, stating the names of the teachers * * * and the amount to be paid to each, may be delivered to the custodian of school moneys * * * the custodian shall deliver to the district clerk or secretary individual checks payable to the order of the teachers."

Section 18:5-57 provides that "nothing in this article shall be construed as giving to the governing body of any municipality any control over the moneys * * * in the hands of the custodian * * * Any ordinance, by-law or resolution of a governing body * * * attempting to control such money, or which shall in any way prevent the custodian * * * from paying the warrants of the board of education as and when they are presented for payment, shall be void."

Section 18:13-17 provides that "No teacher * * * under tenure * * * shall be subjected to a reduction in salary * * * except * * * after a written charge of the cause * * * has been preferred against him," &c.

The evidence is clear that James Goodman is secretary of the North Bergen Board of Education. There is no evidence, whatsoever, as to the public office if any, held by Robert

McNamee. He is referred to in the testimony as "Mr. McNamee of the Mayor's office," and in the brief submitted on behalf of the defendants, his attorney, without naming his official title, describes his duties as "general supervision of foreclosed properties acquired by the Township of North Bergen and collection of rents therefrom."

It must be presumed that the defendants had knowledge of the law applicable to payments of school moneys to teachers and that Goodman as secretary of the board was particularly well versed with the provisions of the title "Education," (*R. S.*) and that he and McNamee knew that under the provisions of section 5-57 of that title, any action of the governing body which sought to control payment of school moneys after they had been duly certified for payment according to law is void. Surely, if the governing body of the township could not control such payments in any way, none of its employees, or the individual officers of the Board of Education could do so. When these defendants agreed to, and did violate the provisions of the statute, it cannot be claimed that they acted either in good faith, or in performance of any duty imposed on them, by statute, or even colorably within the scope of their duties—*ignorantia juris non excusat*.

It is also contended that the defendants' conduct does not affect the public as a whole, and therefore, cannot be a public fraud for which a criminal conspiracy can be committed, and that there is no proof that they conspired "to cheat and defraud a person by any means which if executed would amount to a cheat."

It is sufficiently proved that the defendants acted in concert to illegally acquire and retain the check belonging to Mr. Long.

In the case of *State* v. *Minch et al.,* 160 *Atl. Rep.* 888, the same attack was made upon an indictment based upon section 37 of the Crimes Act (*Comp. Stat.* 1910) which section is reproduced in *R. S.* 2:119-1 under which the complaint herein was made. In that case, two individuals were charged with conspiring, confederating and agreeing together to cheat and defraud a private individual of his monies by

means, which the language of the indictment shows involved the use of no token, and no particular interest of the public was prejudiced by the acts alleged. The court declared "The question presented for decision, is therefore, whether or not, a confederation by individuals to commit a mere private fraud is a crime in this state. While the perpetration of a private fraud by a single individual would not constitute a crime at common law, the contrary appears to be the case where the private fraud is accomplished by a combination of individuals for the purpose of perpetrating it."

This case appears to be dispositive of these contentions of the defendants. Yet, if it were not for this precedent, we would still conclude that the actions of the defendants constituted a public fraud and that the commission thereof was by agreement and arrangement between them, and therefore an indictable conspiracy.

At common law, a conspiracy may be a plan to commit either a crime or an evilly designed scheme or confederacy to cause a civil injury. That the statute (section 37 of the Crimes Act, now *R. S.* 2:119-1) does not pre-empt common law conspiracy, seems well settled. It contains no negative or exclusive words and does not abolish that common law offense, nor does the statute mean that the acts enumerated shall alone constitute the offense of conspiracy. *State* v. *Norton,* 23 *N. J. L.* 33; *State* v. *Loog,* 13 *N. J. Mis. R.* 536; 179 *Atl. Rep.* 623.

A combination is a conspiracy in law, whenever the act to be done has a necessary tendency to prejudice the public or oppress individuals by unjustly subjecting them to the power of the confederates and giving effect to the purposes of the latter, whether of extortion or mischief. *Wharton Cr. L.* 487.

Chief Justice Beasley—*State* v. *Donaldson,* 32 *N. J. L.* 151, says, among other things, "It may be safely said that a combination will be an indictable conspiracy * * * where the confederacy, having no lawful aim, tends simply to the oppression of individuals." Cited in *State* v. *Loog, supra.*

To render a person criminally liable as a conspirator, it is not necessary that under the scheme he should have had any

pecuniary benefit in the matter, or have joined with the view of obtaining pecuniary benefit. *United States* v. *Bradford,* 148 *Fed. Rep.* 413.

In the case of *State* v. *Continental Purchasing Co. et al.,* 119 *N. J. L.* 257; 195 *Atl. Rep.* 827, it was held, "It is not essential to criminal liability for conspiracy under the common law that the acts contemplated should constitute a criminal offense for which, without the elements of conspiracy one alone could be indicted. The true rule is that all such acts as have the necessary tendency to prejudice the public or *to injure or oppress individuals by unjustly subjecting them to the power of the conspirators* are sufficiently tainted with the quality of unlawfulness to satisfy the requirements as to conspiracy."

To enforce payment of a debt from the wages of labor by a proceeding expressly prohibited by statute has been held to be a criminal conspiracy. 229 *Pa.* 609.

It is the well established public policy of our state and nation to create and maintain an efficient public school system as a bulwark of a democratic, independent and vigorous government. The title of the School Law of 1903, now incorporated in *R. S.* 18, title "Education," was "An act to establish a thorough and efficient system of free schools and to provide for the maintenance, support and management thereof." This public policy has been incorporated in the laws of our state, and provides for the tenure of office of teachers, the maintenance and regular payment of teachers' salaries, and has set up special safeguards to prevent their being deprived thereof. The outstanding success of our public school system in creating out of peoples drawn from every corner of the world, a united nation devoted to the principles of "liberty and justice for all," has been due in large measure to the loyalty, devotion, intelligence and unselfishness of the American school teacher, who often receives a salary little better than a pittance, and small recognition for his importance and conscientious public service.

In the instant case, the complaining teacher is endeavoring to support not only himself, but his wife and four young children on a salary of approximately $1,400 a year. It is

not the purpose of this court to comment upon the apparent meagreness of this compensation or upon the fact that it is incommensurate with the importance of the duties and responsibilities of the teacher and the high educational and moral qualifications he must possess. It is necessary, however, to emphasize the "consequences of defendants' harsh, oppressive and unlawful acts" as they may injuriously affect not only Long and his immediate family, but the community as a whole.

In perilous times such as these, the importance of the teacher to the community cannot be exaggerated. The physical safety of our children, now subject to the perils of an all out war, as well as their instruction, devotion and training in our democratic way of life, is committed largely to his care.

There can be no question that the public interest is vitally concerned in seeing that he is not denied or harrassed in obtaining his livelihood.

The American teacher and his means of support cannot be placed at the mercy of the whims, caprice, vindictiveness or political-mindedness of irresponsible public officials. To permit such an intolerable condition would provide a ready and effective means of sabotaging the great and beneficent institution he serves so well, democracy's first line of defense, the American public school system.

Therefore, the defendants will be held to await action of the grand jury.